# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOAN KORNBLUT and TAUBER KORNBLUT, Individually and as Parents and Next Friends of C.K., | ) ) ) | CASE NO. 5:14-cv-1986 |
| | ) | |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) ) | |
| | ) | **MEMORANDUM OPINION** |
| HUDSON CITY SCHOOL DISTRICT BOARD OF EDUCATION, | ) ) | |
| | ) | |
| DEFENDANT. | ) | |

This action is before the Court on plaintiffs' motion for judgment on the administrative record. (Doc. No. 15 ["Motion"].) Defendant Hudson City School District Board of Education (the "District" or "defendant") has filed a brief in opposition (Doc. No. 18 ["Opp'n"]) and plaintiffs have filed a reply (Doc. No. 19 ["Reply"]). The entire administrative record has been filed in hard copy with the Court and was ordered placed under seal. (*See* Doc. Nos. 15, 16.) Throughout this opinion, references will be made to the parties' briefs,[1] as well as to the record, in particular, to notebooks of exhibits presented during the administrative proceedings,[2] to the transcripts of those proceedings,[3] and to the administrative decisions.[4] For

---

[1] All page number references to these briefs are to the page identification number generated by the Court's electronic docketing system.

[2] Plaintiffs' exhibits are designated with letters and defendant's exhibits are designated with numbers. All exhibits are Bates numbered.

[3] There are eighteen transcripts ("Tr.") ranging from the earliest date of September 17, 2013 to the latest date of December 3, 2013. Conveniently these eighteen volumes are consecutively paginated from page 1 in the September 17th volume to page 1403 in the December 3rd volume.

[4] The two administrative rulings, each of which are separately paginated, are in folders in the boxes containing the record: the Impartial Hearing Officer Final Decision of February 7, 2014 (No. SE-2860-2013) ("IHO Ruling"), and the State Level Review Officer Final Decision and Entry of June 13, 2014 (No. SLR-2860-2013) ("SLRO Ruling").

the reasons set forth below, plaintiffs' motion is denied and the administrative rulings are affirmed.

## I. FACTUAL BACKGROUND

On September 8, 2014, Joan and Tauber Kornblut ("parents" as defined by 20 U.S.C. § 1401(23)) ("plaintiffs" or the "Kornbluts") filed this action on behalf of their granddaughter C.K., of whom they have legal guardianship. (Doc. No. 1 ["Compl."].) In October 2006, C.K.'s mother, a high school teacher, was murdered by C.K.'s father in the family home in Hudson, Ohio. C.K., who was then about 17 months old, and her sister (about 3½ years old) were in the home at the time. (Compl. ¶ 17; Ex. L, ¶¶ 1, 4.) C.K.'s father was arrested and later convicted; he is serving a 23-year prison sentence. (Ex. L, ¶ 4.) Both children were placed into the custody of plaintiffs, their maternal grandparents, who had for some time provided daycare while the children's mother was teaching. (*Id.*, ¶ 5.) In 2007, plaintiffs were given permanent custody (Tr. 1225); in 2009, they changed the children's surname to "Kornblut." (Ex. 70.) Although C.K. and her family had resided in Hudson, Ohio, plaintiffs resided in South Euclid, Ohio, where the children went to live. (Compl. ¶ 18.) The children, although close to their grandparents, nonetheless abruptly and violently lost both their parents and their home at the same time. (Ex. L., ¶ 4.)

In 2008, the South Euclid-Lyndhurst City School District ("SELCSD") found C.K. eligible as a preschooler with a disability under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA")[5] (Ex. 72); she was again found eligible in 2010, as her

---

[5] In 2004, Congress reauthorized the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, as the IDEIA. *See* Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), effective July 1, 2005. There is some interchangeable use of these acronyms by the parties; however, the Court will use the acronym IDEIA, except where specifically quoting from case law citing IDEA.

preschool program ended (Ex. 69). At that time, an Individualized Education Program ("IEP") was developed by SELCSD for the school year 2011-12. (Ex. 60.)

There is no dispute that C.K. is a child with a disability. In particular, she has a diagnosis of autism spectrum disorder. Although not diagnosed with posttraumatic stress disorder ("PTSD"), plaintiffs maintain she suffers from that condition also. (*See* Ex. L, ¶ 4.)

In 2008, utilizing Ohio's Autism Scholarship Program ("ASP"), plaintiffs enrolled C.K. at Monarch Center for Autism ("Monarch"),[6] a private school in Cleveland Heights, Ohio. (Ex. L, ¶ 10; IHO Ruling at 7; *see also* Ohio Rev. Code § 3310.41.) The ASP is an educational choice program that grants a scholarship of up to $20,000 per year per child, paid by the child's district of residence ("DOR"), for a child to receive educational and supportive services from a state-approved ASP provider.[7] A child may only participate in the ASP if an IEP has been developed and the DOR agrees to the placement. While the child is on ASP, the DOR is not responsible for providing the student with a free appropriate public education ("FAPE") or with implementing or monitoring the child's IEP. The DOR is only responsible for ensuring that reevaluations are regularly completed and the IEP is annually updated. (Opp'n at 188-89, *citing* Ohio Rev. Code § 3310.41(A)(7) and Ohio Admin. Code § 3301-103-01(L).)

Under the ASP, the district where the child is "entitled to attend" is required to develop her IEP. (Opp'n at 189, *citing* Ohio Rev. Code § 3310.41(A)(7).) Because of C.K.'s unique situation, she is "entitled to attend" public school both in South Euclid, where she resides, and in Hudson, where her father resided at the time of his sentencing. (*Id.*, *citing* Ohio Rev. Code

---

[6] C.K.'s older sister, who also has a diagnosis of autism, has attended Monarch since 2006, when her mother placed her there. (Ex. L., ¶ 10.)

[7] The annual tuition at Monarch is $76,000. (Motion at 86.) Plaintiffs were responsible for amounts over and above the scholarship.

3

§ 3313.65(B)(2).) In November 2010, the Juvenile Division of the Summit County Court of Common Pleas ruled that defendant is responsible for the cost of C.K.'s education because her biological father was residing in Hudson at the time C.K. was removed from his custody. (Ex. 67.)

## II. DISCUSSION

### A.     Administrative Background

In August of 2011, the Kornbluts requested a meeting with the District to discuss its role in C.K.'s education. (Exs. 56, 57; Tr. 223-25.) This meeting occurred on September 22, 2011; it was attended by Kelly Kempf (the District's Director of Pupil Services), the Kornbluts, and Kim Kotynski (a private tutor who accompanied the Kornbluts). (Ex. 55; Tr. 225.) This was not an IEP meeting, but just a discussion to share information and options. (Tr. 223-29.) Following this meeting, C.K. remained at Monarch for the 2011-12 school year; her education was guided by the 2011-12 IEP developed by SELCSD. (Ex. 60.)

On April 27, 2012, an IEP Team[8] was convened by SELCSD to develop C.K.'s IEP for the 2012-13 school year, which the Kornbluts approved by signature of that same date. (Ex. 53.) C.K. remained at Monarch for that school year.

Early in 2013, as C.K. was coming due for her triennial reevaluation ("ETR") (*see* 20 U.S.C. § 1414 (a)(2)(B)(ii); 34 C.F.R. § 300.303), the District contacted Monarch to begin the reevaluation process. It also planned to develop C.K.'s IEP for the 2013-14 school year.[9] (Exs.

---

[8] The IEP Team consists of the child's parents and certain educational professionals as defined in 34 C.F.R. § 300.321.

[9] It is not entirely clear from the record why the District decided to take over this task from SELCSD. Kelly Kempf testified that, since the District was responsible for the IEP, it just "felt more comfortable doing the evaluation." (Tr. at 380.) This seems supported by a notation in the record that the previous ETR had been completed by preschool staff for purposes of a transition IEP, and it was now appropriate for a different team to complete the ETR relating to

4

41, 45.) Jean Graham, the District's school psychologist, contacted Mandi Rickelman, Monarch's early childhood supervisor, and the Kornbluts to obtain their input. (Ex. 47; Tr. 1262.) Because neither the Kornbluts nor Monarch felt that direct observation of C.K. would be beneficial due to her disability, Monarch suggested that the District observe C.K. through video clips which Monarch would provide,[10] and then follow up with consultation with C.K.'s current educators. (Tr. 1264-65.) The planning form was completed and signed on March 7, 2013 by Mrs. Kornblut and representatives from the District. (Ex. 30 at 273-75.) Plaintiffs consented to the reevaluation of C.K. (Exs. 46, 47.) Relevant information was shared with the District by Monarch to assist the District's IEP Team[11] in both the reevaluation and the IEP development. (Exs. 36, 37, 39, 41, 42, 49.) The District relied upon this information supplied by Monarch;[12] it did not ask for anything in addition to what it received. Holly Cifranic, the District's intervention specialist, testified that she received a full profile of C.K. from Monarch's intervention specialist and "assumed that as a professional, the information she had to give me, I was given." (Tr. 253, 283; *see* Ex. 41.[13]) Although a reevaluation can include new assessments, it may also be completed based on a records review only. (IHO Ruling at 8.)

---

school age services. (Ex. 26 at 247, #3.) The change may also have been related to the District's discovery, by way of the Court order, that it was financially responsible for C.K.'s education, coupled with the institution by the Ohio Department of Education ("ODE") of a new online system for application and verification of funding grants, including ASP scholarships, which required the proper district to be named, according to advice from the ODE. (*See* Ex. 51.)

[10] Monarch also had a policy of not permitting direct observation, both to eliminate disruption and to protect the privacy of other students. (Tr. 1098.)

[11] The District's IEP Team consisted of Holly Cifranic, Intervention Specialist; Holly Scott, Speech/Language Pathologist; Jean Graham, School Psychologist; Sandy Palazzo, Occupational Therapist; and Lisa Dietsche, Physical Therapist. (Ex. 30; Tr. 258.) Plaintiffs were also part of the Team.

[12] C.K.'s educational team at Monarch during the 2012-13 school year consisted of Danielle Swan, Intervention Specialist; Heidi Hinderman, Occupational Therapist; Sarah Green, Speech/Language Pathologist; and three associate teachers. (Tr. 1096.)

[13] Ex. 41 is the profile received by the District from Danielle Swann, C.K.'s intervention specialist at Monarch. In a section captioned "Behavior," Ms. Swann noted: "[C.K.] engages in various behaviors that interfere with her

5

A draft ETR and a draft IEP for 2013-14 were prepared by the District. (Exs. 27, 30.) A meeting to review the drafts was scheduled for April 25, 2013,[14] and was intended to cover review of the plans for both C.K. and her sister. When her sister's planning took a significant amount of time, C.K.s meeting was rescheduled to the next day, with everyone's agreement. As it turned out, Mr. Kornblut was unable to attend the rescheduled meeting, but Mrs. Kornblut was there, accompanied by an experienced advocate, Sandee Winkelman.[15] Despite asking many questions, neither Mrs. Kornblut nor her advocate challenged the adequacy of the information relied upon by the District and neither of them requested additional assessments in connection with the ETR. (Tr. 330, 419-20, 867, 1031-32, 1078, 1264-66, 1288, 1366.) During the meeting, the 2013-14 IEP was also reviewed section by section. (Tr. 134-36, 138, 430-31.)

Carrie Hutchinson, the part-time special education coordinator and part-time school psychologist, who had attended the April 26th IEP Team meeting as the District's representative, testified that there were no discussions about C.K. leaving Monarch and transitioning to Hudson, nor did they discuss whether the District would consider an out-of-district ("OOD") placement for C.K. at Monarch. (Tr. 134-35.) In fact, an OOD would not have

---

learning. The behaviors include: scripting, non-compliance, falling to the floor, screaming, and self-injurious behaviors." (Ex. 41 at 334.) Ms. Swann went on to state that "[t]he team uses a five-piece token board" to motivate C.K. to stay on task. (*Id.*)

[14] By letter dated April 16, 2013, the attorney for the Kornbluts advised the District that it was mistaken as to its responsibility for C.K.'s education, since she resided in South Euclid. The attorney further advised that the Kornbluts would not be attending the IEP conference. (Ex. 35.) As it turned out, Mrs. Kornblut did attend, but it is unclear from the record why they altered their position with respect to attendance.

[15] Although Monarch's supervisor, Ms. Rickelman, had been invited, she did not respond to the invitation and did not attend or otherwise participate in the meeting. Mr. Kornblut testified that he had advised Ms. Rickelman that she need not attend because they would have their advocate with them. (Tr. 1253.)

been an option because the IEP Team believed it could supply a FAPE to C.K. within the Hudson Schools[16] and was prepared to implement the IEP. (Tr. 336, 341, 407-09, 862, 869-71.)

At the end of the meeting, an updated copy of C.K.'s IEP, based on the discussions, was immediately supplied to Mrs. Kornblut, who took it home to review with her husband. (Tr. 131-32.) Because the IEP had not been immediately signed, and because Mrs. Kornblut and her advocate had many questions during the IEP Team meeting, a Form PR-01 (Prior Written Notice) was sent to the Kornbluts. Dated May 3, 2013, this notice addressed the primary questions that had been raised, and advised as to why the District was proposing or refusing certain action. (Ex. 26.)

By letter dated May 10, 2013, the Kornbluts returned the IEP signature page to the District, indicating their acceptance of and agreement with the IEP. (Ex. 23; Tr. 144.) The letter also stated: "We have decided to have [C.K.] educated by the District and to implement the IEP. At this time we are requesting the district make transportation arrangements per [C.K.'s] IEP[] so that [she] may begin attending the district." (*Id.*) Plaintiffs requested that the District set up a meeting "to further discuss the details for implementing [C.K.'s] IEP[] in Hudson." (*Id.*)[17]

Ms. Hutchinson contacted the Kornbluts after receipt of their letter. She testified that, after the April 26th meeting, she had had the impression that C.K. was going to continue at Monarch, even though the District believed it could provide C.K. with a FAPE in its schools. She was surprised to receive the letter and found it "vague." (Tr. 134, 145.) In email exchanges, Mrs. Kornblut indicated that it was their desire that the District begin "slowly transitioning [C.K.] to

---

[16] The SELCSD was also of the view that C.K. could receive a FAPE in its district schools. (Tr. 224.)

[17] In both their complaint (Comp. ¶ 34) and their motion (Motion at 86-87), plaintiffs claim they only signed the IEP because they were required to in order to maintain the ASP scholarship until June 30, 2013. This, however, is belied by the May 10th letter.

attend Hudson schools." (Ex. 20 at 226.) When asked by Ms. Hutchinson what was the grandparents' anticipated "timeframe for transition," Mrs. Kornblut responded in an email dated May 14, 2013 that it was their desire that the District would begin educating C.K. "from the date of our signature [i.e., May 10, 2013]." (*Id.* at 225.)

A meeting with the Kornbluts was scheduled for May 21, 2013 to discuss their desire to transition C.K. from Monarch to the District schools. (Ex. 15 at 203.) During the meeting, the Kornbluts were reminded that the transition could not begin until they withdrew C.K. from the ASP. (Ex. 15; Tr. 156-57.) Plaintiffs and their advocate abruptly terminated the meeting upon hearing this. (*Id.*) Before they left, the IEP Team, plaintiffs and their advocate discussed the Extended School Year ("ESY") and how it might be used to transition C.K. to the District. (Tr. 147, 156.) A PR-01 was sent after the meeting to reflect these issues. (Ex. 15; Tr. 156-57.)

Hearing nothing from the Kornbluts after that meeting, the District reached out to them on June 7, 2013 about ESY. (Ex. 14.) On June 10, 2013, Mrs. Kornblut advised that they were "waiting for the doctor to finish his evaluation." (Ex.14.) Although not understood by the District at the time (Tr. 158), this was a reference to a private evaluation being conducted by Dr. Mark Lovinger, a clinical psychologist hired by plaintiffs. Dr. Lovinger eventually opined that a transition from Monarch to Hudson would "have profound effects on [C.K.s] current level of functioning." (Ex. 13 at 199.) A July 16, 2013 letter from the Kornbluts' attorney, which accompanied Dr. Lovinger's report when it was sent to the District, stated that the Kornbluts intended to unilaterally place C.K. at Monarch for the 2013-14 school year at Hudson's expense. (Ex. 13.)

By invitation dated July 26, 2013, the District announced it was reconvening the IEP Team on August 2, 2013 for the purpose of reviewing Dr. Lovinger's report and developing, reviewing, or revising C.K.'s IEP. (Ex. 12; Tr. 234, 237-38.) On or about August 1, 2013, plaintiffs filed a due process complaint under the IDEIA, Ohio Rev. Code § 3323, *et seq.*, and Ohio Admin. Code § 3301-51, *et seq.* (Ex. 3.) They claimed that the District had denied C.K. a FAPE for the 2013-14 school year and for the ESY, that is, for the summer of 2013.

The August 2nd meeting went ahead as scheduled, with plaintiffs participating by telephone. (Ex. 8 at 139.) The District engaged the services of Dr. Michelle DePolo, a child clinical psychologist who was an expert in the areas of autism and anxiety, to consider both transition issues for C.K. and the issues raised in Dr. Lovinger's report. (Ex. 82; Tr. 212-16, 525-26, 692-95.) Plaintiffs assured the District that they took no issue with the 2013-14 IEP that had been developed; they just wanted C.K. to stay at Monarch. (Ex. 8 at 140-41.) Despite the IEP Team's assurances that a FAPE could be provided in Hudson Schools, the Kornbluts indicated they had no interest in continuing the discussion and, after an hour, they terminated their participation in the call. (Tr. 238-39.) They did, however, request that the District develop an appropriate transition plan and send it to them. (Tr. 239.)

The IEP Team created a transition plan and amended the IEP to reflect the Kornbluts' concerns. The transition plan depended on participation by Monarch; the District even agreed to pick up the Monarch tuition for the period of transition. (Ex. 15; Tr. 140, 338-39; 439-41, 552-53.) The August 2, 2013 IEP ("amended 2013-14 IEP") and the transition plans were sent by email and by certified mail to the Kornbluts, along with release forms to allow District consultation with Dr. Lovinger and the Monarch staff. (Exs. 7, 8.) Despite follow-up by the District on September 6, 2013 (Ex. 5), the releases were never signed. Rather, on September

7, 2013, the Kornbluts advised the District that transition at that time was not appropriate and that, should they later choose to transition C.K., they would contact the District. (Ex. 4.)

Based on the Kornbluts' August 1st due process complaint (Ex. 3), administrative proceedings ensued, with the ultimate determination in favor of the District. Plaintiffs brought this action seeking judicial review pursuant to 20 U.S.C. § 1415(i)(2).

**B.      Applicable Law and Standard of Review**

The IDEIA was enacted to give children with disabilities a "free appropriate public education ["FAPE"] … designed to meet their unique needs and prepare them for further education, employment, and independent living[,]" and "to ensure that the rights of children with disabilities and parents of such children are protected[.]" 20 U.S.C. § 1400(d)(1)(A), (B).

The "core of the statute … is the cooperative process that it establishes between parents and schools." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205-06, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). "The central vehicle for this collaboration is the IEP process. State educational authorities ["SEA"] must identify and evaluate disabled children, [20 U.S.C.] §§ 1414(a)-(c), develop an IEP for each one, § 1414(d)(2), and review every IEP at least once a year, § 1414(d)(4). Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide. § 1414(d)(1)(A)." *Id.*

The law includes procedures whereby due process complaints relating to IEPs not satisfactorily resolved by the local educational agency ("LEA") may be brought before an impartial hearing officer ("IHO") and, subsequently, to a state level review officer ("SLRO"). 20

10

U.S.C. § 1415. Further "any party aggrieved by the findings and decision [of the administrative proceedings] … shall have the right to bring a civil action with respect to the complaint … in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).[18]

Under the IDEIA, the district court uses a "modified de novo" standard for reviewing both the procedural and substantive matters addressed during the administrative proceedings. *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir.), *cert. denied*, 531 U.S. 957, 121 S. Ct. 380, 148 L. Ed. 2d 293 (2000). "This standard of review stems from the Supreme Court's holding that courts must give 'due weight' to the state administrative proceedings." *Id.* (quoting *Rowley*, 458 U.S. at 206). Although the precise meaning of "due weight" has not been defined, the Sixth Circuit has noted "a court cannot simply adopt the state administrative findings without an independent re-examination of the evidence." *Id.* at 566 (citation omitted). "[T]he weight due will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Id.*

"With regard to procedural matters, a court should 'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid." *Id.* (quoting *Dong v. Bd. of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999) (additional citation omitted)).

---

[18] The Court notes that no party here has asked that additional evidence be heard. Therefore, this matter can be decided on the briefs and the administrative record.

"If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." *Dong*, 197 F.3d at 800 (citation omitted).

"As for substantive issues, the preponderance of the evidence language in the [statute] is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Burilovich*, 208 F.3d at 566 (internal citations and quotation marks omitted). Therefore, "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both. A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable. By so deferring, 'due weight' will have been given to the state administrative proceedings." *Id.* at 567.

Should a court find that a school district has failed to provide a FAPE, the court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education[.]" *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239, 129 S. Ct. 2484, 174 L. Ed. 2d 168 (2009).

## C. Errors Raised for Review

### 1. The IHO/SLRO erred by failing to find that the Hudson City Schools did not properly evaluate and identify C.K.'s educational needs

This assignment of error is aimed at the quality of the triennial evaluation required by the IDEIA and its resulting ETR.

Title 20 U.S.C. § 1414(a)(1) requires an initial evaluation to determine whether a child has a disability within the meaning of the statute. Thereafter, reevaluations are required at

least every three years, unless the parents and the local educational agency ("LEA") agree it is unnecessary. 20 U.S.C. § 1414(a)(2). In conducting these evaluations, the LEA must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent," 20 U.S.C. § 1414(b)(2), to assist in determining the contents of the IEP.[19]

Plaintiffs challenge the District's 2013 reevaluation of C.K., raising two underlying errors in the administrative proceedings. First, they assert it was error for the IHO to conclude (and the SLRO to affirm) that the District's evaluation team members did not have access to conduct direct assessments of C.K., which would have impacted the information available for development of the IEP, and, further, that the team reasonably relied upon the information furnished by Monarch. Second, they assert that the IHO committed error by not making any determination whether an evaluation was needed to analyze C.K.'s behavior and how it may relate to her childhood trauma. (Motion at 91-92.)

Plaintiffs specifically argue that no one from the District ever informed Monarch that additional information was needed; that no one ever asked to conduct further assessments of C.K. and, in particular, never asked that she be brought to Hudson for evaluation in its setting; and that no member of the District IEP Team ever indicated that the video clips of C.K. were inadequate or failed to provide sufficient information. These factual assertions are true and are supported by the record. The problem is that the mere truth of these facts does not require a legal conclusion that there was any failure on the District's part within the contours of the IDEIA.

---

[19] Prior to conducting any evaluation, notice must be given to the parents describing any evaluation procedures the LEA will use. There is no question that this notice was given and that plaintiffs consented to the reevaluation as described in the notice. (*See*, Exs. 47, 48.)

In the first place, notwithstanding plaintiffs' current suggestion to the contrary,[20] it was clearly Monarch's policy not to permit direct classroom observation because strangers entering the classroom would be very disruptive and upsetting to the students, who are already significantly challenged by their disabilities. (Tr. 1098.) Therefore, direct observation in the private education facility was not an option for the District.

As for bringing C.K. to Hudson for a direct evaluation, Jean Graham, the school psychologist who coordinated the April 2013 IEP meeting, consulted Carrie Hutchinson, the District's special education coordinator, about the best way to do an evaluation. Ms. Hutchinson thought it best not to bring C.K. to Hudson, but rather to have the District's personnel go to Monarch. (*Id.* 1268-70.)

Furthermore, the record supports a finding that the videos provided an adequate picture of C.K. in her educational environment. The videos, a total of 50-60 minutes, showed C.K. in a speech session, in a one-on-one reading session, in occupational therapy, and during a tantrum where she was self-injurious (slapping her face, screaming and yelling), this latter being one of the behaviors that plaintiffs believe the District should have considered. (*Id.* 1101-02.) In addition, in March 2013, prior to the reevaluation, C.K.'s teacher at Monarch emailed the District a detailed profile description and measurable goals with accurate present levels. (Ex. 41; Tr. 977.)

Finally, the District asked both C.K.'s teacher at Monarch and Mrs. Kornblut to separately complete standardized assessments related to C.K.'s social/emotional status and her

---

[20] In their Motion before this Court, plaintiffs assert that the IHO "erroneously concluded that the Hudson IEP members did not have access to conduct direct assessments of C.K." (Motion at 91.) But, in their brief filed after the hearing before the IHO (included in the administrative record supplied to the Court), plaintiffs acknowledged: "It is the policy of Monarch to permit observation through prerecorded video to minimize distraction to the classes and to protect the privacy rights of other children." (Pet'r Post-Hearing Brief at 5, citing Tr. 1098.)

14

adaptive behavior at both school and home. These evaluations were available to the District and were included in the ETR. (Ex. 30 at 281-85; 291-93; Tr. 1274-83.)

The record shows, therefore, that the District purposefully chose particular evaluation strategies, within the scope of 20 U.S.C. § 1414(b)(2)(A), aimed at getting "relevant functional, developmental, and academic information" about C.K., without being unduly disruptive of the child's (or other children's) routine. These are professional judgments that must be given due weight by this Court.

The record also shows that, during the 3-hour April 26, 2013 meeting of the IEP Team wherein the ETR and 2013-14 IEP for C.K. were carefully reviewed with Mrs. Kornblut and the advocate accompanying her, despite their many clarifying questions, they neither challenged the thoroughness of the reevaluation nor questioned the adequacy of the information supplied by Monarch. (Tr. 419-20.) The record further shows that the professionals on the District IEP Team believed they had good and sufficient data from Monarch to both conduct the reevaluation and develop goals for the C.K.'s IEP. (*Id.*)[21] The Team found no gaps in the information and had no need for anything additional. Once again, these are professional determinations that are given due weight by the Court.

Plaintiffs have not shown any failure on the part of defendant and/or any error in the administrative decisions with respect to their first assignment of error on appeal.

This assignment of error is overruled.

---

[21] Plaintiffs claim that the evaluation planning form shows no data available in many areas. (*See* Ex. 30 at 274.) But that misinterprets the form; the "N/A" indicates, as footnoted, that there is no need for additional information because there is "[s]ufficient data to determine eligibility." (*Id.*)

15

    **2.**    *The IHO/SLRO erred in not finding that the Hudson City Schools IEP Team violated the IDEA's procedural and substantive mandates for developing C.K.'s April 25, 2013 IEP.*

This assignment of error is aimed specifically at the procedural and substantive requirements in the IDEIA for development of an IEP.

Plaintiffs broadly attack "all the IEP components that are in violation of the [IDEIA]," and do so mostly by reference to the post-hearing brief filed in the state administrative proceedings, claiming that "the IHO completely ignored all of the substantive content of the April 2013 IEP[,]" and "failed to apply the proper legal standard for [34] C.F.R. [§] 300.320 when making a determination that the substantive content of the IEP provided FAPE." (Motion at 93.) Claiming they are constrained here by the page limits, plaintiffs do not supply pinpoint page citations to the post-hearing brief, but rather leave it to the Court to ferret out their arguments before the IHO.[22] That said, in its attempt to understand the arguments raised here, the Court has read and considered the post-hearing brief.[23]

---

[22] Both the Court's Initial Standing Order (Doc. No. 3) and its Case Management Plan (Doc. No. 14) require pinpoint citations to the record. This is especially important where, as here, the record is quite large and, adding to the difficulty, is not electronically available. The Court is not required to construct plaintiffs' argument from the record or to search out facts from the record that would support plaintiffs' arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). Nor is the Court required to simply take plaintiffs' word for it that their assertions are contained somewhere in the record. *See, e.g., Carlton v. Worcester Ins. Co.*, 923 F.2d 1, 2 (1st Cir. 1991) ("With respect, we cannot merely take counsel's word for it in the summary judgment milieu."). Page limits do not explain plaintiffs' failure to assist the Court with appropriate record citations.

[23] The Court notes that the post-hearing brief attacks the goals of C.K.'s 2013-14 IEP in some detail. Two examples: as to Goal 1, plaintiffs complain that the IEP set a goal for C.K. to be able to write on ¼-inch lined paper, whereas Monarch had only required and recommended 1-inch lined paper; as to Goal 2, relating to independent skills with fasteners such as zippers, buttons, snaps and shoe tying, plaintiffs argue that the goal as written is "a far reach from C.K.'s present level." These allegedly misguided goals were attributed by plaintiffs to the failure to have an occupational therapist present at the IEP meeting. (Post-Hearing Brief at 17-18.) But, aside from the fact that an occupational therapist is not a required member of the IEP Team, *see* 34 C.F.R. § 300.321(a), these are the very kinds of detail that require a certain amount of professional expertise to which this Court must assign due weight. A reviewing Court does not sit to supply that level of micro-analysis of an IEP.

Plaintiffs argue that the IHO relied solely on the professional judgment of the District staff who, in turn, "relied almost entirely on the information provided by Monarch, yet made some changes to that information without any just basis or support resulting in an inappropriate IEP." (Motion at 93.) Plaintiffs do not specifically identify the changes and/or why those changes, assuming they were made at all, would have rendered the IEP less than beneficial for C.K. As noted above, it was not unreasonable for the District to rely on information supplied by C.K.'s then-current school.[24] Nor was this reliance outside the permissible range of evaluative methodologies and procedures. *See* 34 C.F.R. § 300.305(a).

Plaintiffs assert, without record citation, that the IHO erred by dismissing their input and testimony as mere "feelings," rather than objective data aimed at aiding the decision-making process. However, Mr. Kornblut clearly testified: "I think these two girls [C.K. and her sister], because of their special requirements, need more than a Chevy education. And that's what I'm after is to give them more than a Chevy education." (Tr. 1371.) No one would fault the Kornbluts for this sentiment; but the District's responsibility is to supply a FAPE, which means providing an education that falls somewhere between "maximiz[ing] the potential of handicapped children," *Rowley*, 458 U.S. at 189, which is not required, and "more than *de minimis*[,]" *Doe By and Through Doe v. Smith*, 879 F.2d 1340, 1341 (6th Cir. 1989) (citation omitted), which is required.[25] The mere fact that the District did not honor the Kornbluts' desire

---

[24] Plaintiffs' position with respect to Monarch is oddly inconsistent. On the one hand, plaintiffs insist that Monarch is the only appropriate placement for C.K., while on the other hand suggesting that the information Monarch supplied to the District should not have been relied upon by the District.

[25] The Sixth Circuit has expressly stated: "The [IDEA] requires that [the public school] provide the educational equivalent of a serviceable Chevrolet to every handicapped student. [Parent], however, demands that [the school] provide a Cadillac solely for [the child's] use. We suspect that the Chevrolet offered … is in fact a much nicer model than that offered to the average [public school] student. Be that as it may, we hold that the Board is not required to provide a Cadillac, and that the proposed IEP is reasonably calculated to provide educational benefits to [the child], and is therefore in compliance with the requirements of the IDEA." *Doe By and Through Doe v. Bd. of Educ. of Tullahoma City Schools*, 9 F.3d 455, 459-60 (6th Cir. 1993).

to place C.K. at Monarch, at public expense, is not proof that she was not provided the requisite FAPE.

Plaintiffs argue generally that there was nothing individualized about the 2013-14 IEP proposed by the District for C.K. They broadly claim, without identifying any particulars in their motion, that the IEP lacked "present levels, appropriate and measurable goals, and her required related services, accommodations, modifications, [and] aide support." (Motion at 93.)[26] This is simply not correct. The IEP contained a lengthy profile of C.K. which outlined her present levels in considerable detail. (Ex. 27 at 250-52.) It further contained several pages of measurable annual goals. (*Id.* at 253-61.) Finally, it outlined specially designed services, including occupational and physical therapy, as well as speech and language services. (*Id.* at 262-63.)

Plaintiffs criticize the District's failure to consider delivery of services one-to-one at all times, in the manner allegedly delivered by Monarch. (Motion at 94.) A review of Section 7 of the 2013-14 IEP belies this assertion. (*See* Ex. 27 at 262.) In any event, the goal of all education, and even more so special education, is to allow children "to lead productive and independent adult lives, to the maximum extent possible." 20 U.S.C. § 1400(c)(5)(A)(ii). A particular purpose of the IDEIA is to "prepare [children with disabilities] for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). Therefore, to the extent the service delivery in Section 7 might be read to *not* include exclusively 1:1 methods, one must

---

[26] Plaintiffs also assert, with reference to a non-existent regulation [34 C.F.R. 300.324(6)(b)], that the District IEP Team was required to consider C.K.'s prior IEP, which, admittedly, they did not do. (Tr. 162.) This is not correct under the facts of this case. Typically, IEPs are developed annually and, naturally, the regulations would require that, in developing a new annual IEP, the Team would consider the prior IEP. 34 C.F.R. 300.324 (b). But IEPs can also be developed in conjunction with the triennial reevaluation, which is what occurred here. In that case, the Team "must consider" several components, including, "[t]he results of the … most recent evaluation of the child[.]" 34 C.F.R. § 300.324(a)(iii). Nothing prohibits consideration of the prior IEP; but nothing requires it either.

presume that the goals were written with an eye toward advancing C.K.'s educational progress rather than permitting her to stagnate at a less challenging level. There is no requirement that the District must duplicate the exact services and methods of delivery that C.K.'s private placement had utilized. There are many ways to meet the same educational ends, and the District's sole responsibility is to provide a FAPE.

Plaintiffs assert that the IEP does not provide any accommodations to C.K.'s environment or modifications to her curriculum. Again, the motion offers no detail; but the post-hearing brief filed before the IHO presents the critique that, using the 2013-14 IEP drafted by the District, C.K.'s "teachers or service providers … would have no idea what or how to provide C.K. with accommodations in the classroom." (Post-Hearing Brief at 31.) The brief further notes that the service plan written by Monarch states that accommodations for C.K. include minimizing distractions, the use of visuals to aid in comprehension of instruction, 1:1 instruction, token boards, adapted paper, and extended time of no more than 30 minutes. (*Id.*) Assuming this is the critique now being offered by plaintiffs' motion, the Court must reject it. The IEP contained a very detailed profile of C.K., which mentions every one of these accommodations. (Ex. 27 at 250-51.) There is no requirement that the IEP "include information under one component … that is already contained under another component…." 34 C.F.R. § 300.320(d)(2).

Plaintiffs assert that the 2013-14 IEP failed to include positive behavior interventions to address C.K.'s self-injurious behaviors that interfere with her ability to access education.[27] Although, for "a child whose behavior impedes the child's learning," the school district must "*consider* the use of positive behavioral interventions and supports, and other

---

[27] Plaintiffs identify as a "procedural error" the District's failure to check "yes" in Section 2 of the IEP, indicating that C.K. has behaviors which impede her learning. But that was a mere "technical deviation," *Dong, supra,* that was corrected in the amended version of the IEP developed in August 2013. (*Compare* Ex. 27 250 at *with* Ex. 8 at 137.)

strategies, to address that behavior[,]" 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added), there is no requirement that the IEP include a behavior plan or goal *unless* a child has been removed from school for misconduct that is a manifestation of the child's disability. *See* 34 C.F.R. § 300.530(d)(1)(ii) ("[a] child with a disability who is removed from the child's current placement [for disciplinary reasons, for possessing a weapon or drugs, or for inflicting serious bodily injury on another] must … [r]eceive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur.").

Finally, plaintiffs argue that the IEP Team failed to consider the potential harm to C.K. when determining her least restrictive environment ("LRE"). This particular issue is included in the discussion under assignment of error #4 and need not be repeated here.

The question for this Court is whether the 2013-14 IEP was "reasonably calculated to enable [C.K.] to receive educational benefits[.]" *Rowley*, 458 U.S. at 207. The Court's review concludes that it was, and plaintiffs have supplied no convincing argument or evidence to the contrary. In fact, the undeniable record evidence is that the Kornbluts *approved* the original, unamended, 2013-14 IEP on May 10, 2013. (*See* Ex. 27.) Only belatedly have they raised all the challenges, some of which the District attempted to address, as appropriate, by reconvening the IEP Team on August 2, 2013 to consider Dr. Lovinger's report and to amend the IEP accordingly. It is clear that the Kornbluts' objections arose only after they realized that the District would not approve a placement at Monarch at District expense or would not permit admission to the public school without the Kornbluts first relinquishing the ASP, which is required by law.

This assignment of error is overruled.

***3.  The IHO/SLRO erred by failing to find that the Hudson City Schools failed to offer  C.K. appropriate ESY services for the 2013 summer***

Plaintiffs argue that the 2013 ESY services were not appropriately tied to C.K.'s IEP, were based upon a complete lack of relevant data, and were unilaterally determined, and limited, by the District. They claim there was no discussion during the April 2013 IEP Team meeting relating to ESY for C.K.

Plaintiffs' argument is misleading. Three people testified that there was little to no discussion at C.K.'s IEP Team meeting about ESY services because those services had been discussed in depth the day before during C.K.'s sister's meeting, and the discussion at that time had applied to both girls. (Tr. 140, 337-38, 370, 827, 861.) The 2013-14 IEP for C.K. contains a page for "specially designed services" directed at ESY. (Ex. 27 at 264.) Although plaintiffs' motion claims there is "an issue involving the services proposed by the District[,]" (Motion at 101), there is no discussion as to what that particular "issue" might be. Further, the record reflects that it was the Kornbluts who ultimately decided to send C.K. to a summer camp, rather than utilize the ESY services of the District, because they "wanted to remove the schooling part for [her] for the summer." (Tr. 1249.) They wanted C.K. to have "a good time." (*Id.*)

This assignment of error is overruled.

***4.  The IHO/SLRO erred in allowing and relying upon retrospective testimony, and evidence improperly admitted into the record***

Under 34 C.F.R. § 300.116(d), "[i]n selecting the [least restrictive environment], consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs[.]" Plaintiffs assert that the IEP Team failed to consider the potential harm to

C.K. when determining her LRE.[28] They claim the District never even discussed with them the possibility of placement at Monarch. They argue that the District failed to credit the expert opinion of Dr. Lovinger[29] and, in addition, that it considered "retrospective testimony" and other evidence improperly admitted into the record, in particular, evidence and testimony from Dr. Michelle DePolo. Dr. DePolo, a child psychologist who specializes in autism, was retained by the District to conduct a comprehensive review of the District school that C.K. would attend to ascertain whether it was able to meet C.K.'s needs, especially in light of Dr. Lovinger's evaluation.[30]

As a threshold matter, the Court cannot fault the District for not discussing placement of C.K. at Monarch. There was never any request from the Kornbluts that such placement be considered. (Tr. 134-35; 165-67.) The District does consider out-of-district placements, and even private school placements, but only where a child's needs cannot be met within the public school setting. (Tr. 137; 165.) Here, the District believed it could meet C.K.'s needs and provide a FAPE within its own schools. (*Id.*)

With respect to the issue of potential harm, plaintiffs first challenge the use or consideration of Dr. DePolo's input, arguing that it constituted "retrospective testimony" that has been rejected by courts. They rightly claim that courts "must limit [their] evaluations of [the

---

[28] Plaintiffs criticize the fact that Section 11 (dealing with Least Restrictive Environment) "was already filled in on the draft IEP indicating Hudson predetermined C.K. would attend Hudson." (Motion at 98.) But, of course, that is the very nature of a "draft." It is a starting point, and it is not surprising that the District would have listed a *public school* as the starting point for the provision of a "free appropriate *public* education" to C.K.

[29] This challenge was actually raised under assignment of error #1; but, because it is so closely related to assignment of error #4, the Court has decided to address it in this section of the opinion.

[30] Dr. DePolo attended the August 2, 2013 meeting, which was conducted to specifically address the concerns raised by Dr. Lovinger's evaluation of C.K. (Ex. 12 at 194.) Dr. Lovinger did not attend that meeting. Plaintiffs assert that the District did not ask to speak with Dr. Lovinger prior to the August 2, 2013 meeting, nor did Dr. DePolo speak with Dr. Lovinger. Both of these facts are true; however, neither the District nor Dr. DePolo would have been permitted to consult with Dr. Lovinger directly without the Kornbluts' approval. Although the Kornbluts indicated they would sign releases for that communication to occur, Mr. Kornblut admitted that they never did. (Tr. 1368.)

school's] proposed IEP to the terms of the document itself, as presented in writing to the [parents]." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001). But, of course, that would require this Court to exclude consideration of not only Dr. DePolo's input, but also Dr. Lovinger's. The fact remains that on May 10, 2013, the Kornbluts signed and approved the April 2013-14 IEP that they are now trying to challenge through use of Dr. Lovinger's evaluation, conducted on May 23, 2013.[31] They want the Court to disregard input from Dr. DePolo because it is post-April 2013 IEP, while at the same time asking the Court to consider Dr. Lovinger's evaluation, which is *also* post-IEP.

But, even if the Court takes plaintiffs' suggestion and considers only Dr. Lovinger's opinion and not Dr. DePolo's, it need not conclude, on this record, that the District denied C.K. a FAPE.

In his evaluation of C.K., Dr. Mark Lovinger concluded:

> In assessing the potential transition of [C.K.] from her current educational setting at Monarch to Hudson Public School, it is our opinion that such a transition would have profound effects on her current level of functioning. It is with a high level of scientific certainty that any significant change in her already familiar routine will cause [C.K.] to regress behaviorally and emotionally and will present significant behavioral management challenges for all of her caretakers.

(Ex. 13 at 199.) Plaintiffs assert that Dr. Lovinger "was asked to consider and evaluate the harmful effect of moving C.K. from Monarch to Hudson, not for purposes of evaluating her autism." (Motion at 89.) Dr. Lovinger concluded that C.K. is "not [a] typical autistic child[]." (Tr. 652.) Rather, because she has "undergone a complex psychic trauma, ... [she is] in a

---

[31] Mr. Kornblut testified at the IHO hearing that he "signed the paper [the IEP] ... [but then] thought about the fact that we would have to lose the scholarship and if it didn't work out, I was scared. So I backed off and decided to have [C.K.] evaluated to find out if what we're doing was the right thing for [her]." (Tr. 1245.)

completely different category of care." (*Id.*) In his view, C.K. "deserve[s] the best that can be offered to [her], because [she has] gone through horrors[.]" (*Id.*)

Despite this opinion that a transition to Hudson would be bad for C.K., when pressed during the administrative hearing as to what would happen to C.K. should the Kornbluts no longer be able to afford her private schooling, Dr. Lovinger testified:

> … then of course they'll have to deal with that. I'm suggesting that if it doesn't have to be forced, then not to have to do that. … [O]f course, life circumstances are unpredictable, but for children who have been traumatized, as I said, we go out of our way to go the extra step and do for them what we can, because they have suffered, and they have suffered beyond what other children suffer … autistic or not.

(*Id.* 676.) When further pressed, Dr. Lovinger said the key to a smooth transition for C.K. was consistency, and he admitted that the historical examples of transitioning he had been given by the Kornbluts only reflected C.K.'s *difficulty* in transitioning, not any *inability* to transition. (*Id.* 677-78, 679.) If transition was unavoidable, he would advise the Kornbluts to "see somebody who could really specialize in doing transition plans with traumatized or autistic children." (*Id.* 679.) He was under the impression that C.K.'s transition to Hudson, if any, would be "cold turkey." (*Id.*) Dr. Lovinger had been given the District's proposed transition plan for C.K. (*see* Ex. 8 at 163-67), but admitted he had not taken time to look at it. (*Id.*)

Even crediting only Dr. Lovinger's opinion does not require the conclusion that C.K. would be unable to transition to the District and/or would be irreparably harmed by any attempt to do so. It is clear that Dr. Lovinger, understandably, was recommending that this child be spared *any* further trauma, and the grandparents had that same goal. However, that is not the standard for this Court's analysis. All of the professionals in this case, even Dr. Lovinger, acknowledged that life involves transitions and that autistic (and traumatized) children are best

served by carefully crafting transition plans, when necessary, and by teaching them coping strategies. There is no allegation that the District's teachers and other support professionals were not equipped to handle this transition for C.K.

Plaintiffs also seem to suggest that failure to discuss a transition plan constituted a procedural error. That argument is rejected. There is no requirement that a transition plan even be included in C.K.'s IEP, given her age. *See* 20 U.S.C. §§ 1414(d)(1)(A)(i)(VIII) (transition plans required with the first IEP after the child turns 16). Further, discussion of transition was actually attempted during the April 2013 IEP Team meeting, but had to be suspended because Mrs. Kornblut needed to leave. There was an understanding that plaintiffs would arrange a visit to the Hudson school C.K. would attend and then the parties would reconvene. (*See* Ex. 26 at 248 ("The team is also waiting for dates from the grandparents to set up a visit to Ellsworth Hill Elementary to see the educational programs in regards to a possible transition to the Hudson City School District for [C.K.].").) Plaintiffs derailed that plan; they never set up the visit and they declared on July 16, 2013 that C.K. would continue to attend Monarch. (*See* Ex. 13.)

Finally, plaintiffs challenge the alleged failure to consider the negative impact of a lengthy bus ride for C.K. from her home in South Euclid to Hudson. But this was discussed, at least briefly, and the District agreed that provisions could easily be made for a portable DVD player so C.K. could watch movies in the van on her way to school. (Tr. 336-37.)[32]

Without allowing the District an opportunity to complete any transition plans or to fully consider the implications, if any, of Dr. Lovinger's evaluation, the Kornbluts made the

---

[32] In addition, the ride between Hudson and South Euclid would not have been a new experience for C.K., who successfully made the trip daily when her mother was alive, to be dropped off at her grandparents in South Euclid for day care, and also after her mother's death, when her grandfather brought her to Hudson twice a week for private tutoring. (Tr. 1225; 1236-37.)

unilateral decision to continue C.K.'s schooling at Monarch. This, of course, was their prerogative. But the District did not deny C.K. a FAPE.

This assignment of error is overruled.

### III. CONCLUSION

For the reasons set forth herein, the Court concludes that plaintiffs Joan and Tauber Kornblut, legal guardians of C.K., a child with a disability, have failed to establish by a preponderance of the evidence that the Hudson City School District Board of Education denied C.K. a free appropriate public education for the school year 2013-14 and/or denied C.K. extended school year services for 2013. Accordingly, their assignments of error are all overruled and the decision by the Independent Hearing Officer, as affirmed by the State Level Review Officer, is affirmed. In light of this conclusion, plaintiffs are not entitled to any reimbursements for C.K.'s educational expenses for the 2013-14 school year or extended school year.

**IT IS SO ORDERED**.

Dated: September 2, 2015

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**